IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE STATE OF FLORIDA, | ) | |
| | ) | |
| *by* Mike Haridopolos, in his official capacity | ) | |
| as President of the Florida Senate, | ) | |
| 409, The Capitol | ) | |
| Tallahassee, FL 32399-1100; | ) | |
| | ) | |
| *and* Dean Cannon, in his official capacity as | ) | |
| Speaker of the Florida House of | ) | Civil Action No. |
| Representatives, | ) | 1:12-cv-00380-RMC-JRB-EGS |
| 420, The Capitol | ) | |
| Tallahassee, FL 32399-1300; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| U.S. Attorney For the District of Columbia | ) | |
| Civil Division | ) | |
| 4th Floor | ) | |
| 501 Third Street, N.W. | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| ERIC H. HOLDER, JR., in his official | ) | |
| capacity as Attorney General of the United | ) | |
| States | ) | |
| Office of General Counsel | ) | |
| Justice Management Division | ) | |
| Department of Justice | ) | |
| 145 N. Street, N.E. | ) | |
| Washington, D.C. 20530 | ) | |
| Defendants. | | |

---

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
PURSUANT TO THE PROVISIONS OF SECTION 5 OF THE
VOTING RIGHTS ACT OF 1965, AS AMENDED, 42 U.S.C. § 1973c,
AND REQUEST FOR THREE-JUDGE COURT**

---

Plaintiff brings this action for declaratory judgment pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, (hereinafter "Section 5"), and 28 U.S.C. § 2201, *et seq.* Plaintiff respectfully would show the Court the following:

1.      This action is filed for the purpose of obtaining a declaratory judgment that the State House redistricting plan contained in SJR 1176 ("SJR 1176" or "House Plan"), a joint resolution passed by the Florida Legislature on February 9, 2012; the Congressional redistricting plan contained in SB 1174 ("SB 1174" or "Congressional Plan"), an act passed by the Florida Legislature on February 9, 2012, and signed by the Governor on February 16, 2012; and the State Senate redistricting plan contained in SJR 2-B ("SJR 2-B" or "Senate Plan"), a joint resolution passed by the Florida Legislature on March 27, 2012; satisfy Section 5 of the Voting Rights Act because they have neither the purpose nor the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group, or of diminishing minority voters' ability to elect their preferred candidates of choice, in the five Florida counties covered by Section 5, and that the House, Senate, and Congressional Plans may be enforced by the State of Florida. SJR 1176, SB 1174, and SJR 2-B, which will take effect in the regularly scheduled 2012 primary and general elections, provide for the decennial redistricting of Florida's 120 State House districts, 40 State Senate districts, and 27 United States House of Representatives districts.

## Parties

2.      Plaintiff, the State of Florida, is a State of the United States of America and brings this duly authorized action on behalf of itself and the citizens of the State of Florida. The President of the Florida Senate and the Speaker of the Florida House of Representatives are designated as the joint submitting authorities for the House, Senate, and Congressional Plans.

3.      The United States is a proper defendant in this action because "[a] State or political subdivision wishing to make use of a recent amendment to its voting law [that is covered by Section 5] . . . has a concrete and immediate 'controversy' with the Federal Government." *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966).

4.      Eric H. Holder, Jr. is a proper defendant in his official capacity as the Attorney General of the United States and is principally responsible for enforcing the Voting Rights Act of 1965, including the defense of Section 5 litigation in the United States District Court for the District of Columbia.  42 U.S.C § 1973c(a).

## Jurisdiction and Venue

5.      This action is brought pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2201, under which this Court is authorized to issue the declaratory judgment Plaintiff seeks.  This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 1331.

6.      Venue is proper in this Court pursuant to Section 5, 42 U.S.C. § 1973c, and 28 U.S.C. § 2284.

## Three-Judge Panel Required and Requested

7.      The State of Florida is not itself a jurisdiction covered by and subject to the "preclearance" requirement of Section 5, but five counties in Florida (Collier, Hardee, Hendry, Hillsborough, and Monroe Counties) are covered by and subject to Section 5.  *See* 28 C.F.R. pt. 51, app.  Thus, the House, Senate, and Congressional Plans are subject to Section 5's "preclearance" requirement to the extent (and *only* to the extent) that they affect minority populations in these five covered counties.  Section 5 provides that no voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 that affects a covered jurisdiction may be enforced

3

unless and until (a) this Court enters a declaratory judgment that the qualification, prerequisite,

standard, or procedure has neither the purpose nor the effect of denying or abridging the right to

vote on account of race or color, or in contravention of the guarantees set forth in 42 U.S.C.

§1973b(2) (which similarly protect members of language minority groups); or (b) the

qualification, prerequisite, standard, or procedure is submitted to the Attorney General for

preclearance and an objection is not interposed within sixty days.

8.      This action is properly determinable by a district court of three judges in

accordance with 42 U.S.C. § 1973c and 28 U.S.C. § 2284.

### **Factual Allegations**

9.      The Florida Legislature is composed of two bodies: the Senate, which is divided

into 40 single-member seats, and the House of Representatives, which is divided into 120 single-

member seats.  Fla. Const. art. III, § 1.

10.     Members of the Senate are elected to staggered four-year terms, except that in the

election following a reapportionment some senators may be elected for two-year terms if

necessary to maintain staggered terms.  *Id.* § 15(a).

11.     Members of the House are elected to two-year terms in each even-numbered year.

*Id.* § 15(b).

12.     Prior to the 2010 Census, the State of Florida was apportioned twenty-five seats in

the United States House of Representatives.

13.     The results of the 2010 Census, however, revealed that the State's population had

grown and shifted substantially over the past decade.  As a result of this growth, Florida was

apportioned two additional seats in the United States House of Representatives.  In addition, the

population changes Florida experienced over the decade necessitated revisions to the

Congressional and State House and Senate district boundaries, to comply with federal and state constitutional one-person-one-vote requirements. *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964); U.S. Const. art. I, § 2, cl. 3; *Id.* amend. XIV, § 2; Fla. Const. art. III, § 16(a).

14.     Prior to the Legislature's consideration of new House, Senate, and Congressional redistricting plans, the Senate Committee on Reapportionment and the House Redistricting Committee held 26 public hearings in various locations across the state, including hearings in all five counties covered by Section 5.

15.     In addition, the Florida Senate and Florida House of Representatives encouraged members of the public to create and submit their own plan proposals and both provided internet applications that enabled the public to do so.  As a result of these measures, the Legislature received 177 public submissions of partial or complete maps and thousands of additional written comments.

16.     In light of this public input, the Senate Committee on Reapportionment and the House Redistricting Committees adopted proposed House, Senate, and Congressional plans.

17.     After considering, debating, and amending the proposed House plan, the Legislature enacted SJR 1176, which received support from black, Hispanic, and white members. In particular, the House Plan had the support of nine Hispanic Representatives.

18.     After considering, debating, and amending the proposed Congressional plan, the Legislature enacted SB 1174, which received support from black, Hispanic, and white members. In particular, the Congressional Plan passed the Senate with all three Hispanic senators and three of six black Senators voting in favor of the plan, and passed the House with the support of nine Hispanic Representatives in the House.

19.     After considering, debating, and amending the proposed Senate plan, the Legislature enacted a Senate plan contained in SJR 1176, the same joint resolution that provides for redistricting of the Florida House of Representatives.

20.     The Florida Supreme Court, however, struck down the Senate plan contained in SJR 1176 as inconsistent with state constitutional provisions regarding redistricting that were adopted in 2010. *See In re Senate Joint Resolution of Legislative Apportionment 1176*, No. SC12-1, 2012 WL 753122 (Fla. Mar. 9, 2012).

21.     After further consideration and debate, the Legislature enacted SJR 2-B, a joint resolution that redistricts the Senate consistent with the Florida Supreme Court's holdings and instructions.  SJR 2-B received support from black, Hispanic, and white members of the Legislature.  In particular, the Senate Plan had the support of one black and three Hispanic Senators.

22.     The House, Senate, and Congressional Plans do not have the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

23.     Compared to the Benchmark Plans, the House, Senate, and Congressional Plans do not lead to retrogression in the position of racial or language group minorities with respect to their effective exercise of the electoral franchise or diminish their ability to elect their preferred candidates of choice, and do not otherwise have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, in any "performing" minority district within any of the five covered counties.

24.     Within the covered counties, the House Benchmark Plan contained four performing districts where minority populations had the ability to elect their preferred candidates

of choice—Benchmark House Districts 55, 58, 59 and 112.  Benchmark House District 55, which includes population from Hillsborough County, is currently represented by Representative Darryl Rouson, a black Democrat.  Under the 2010 Census, Benchmark House District 55 was composed of a 49.4% BVAP and 13.6% HVAP, and was underpopulated by 23,566 people, or 15.0%.  Benchmark House District 58, which includes population from Hillsborough County, is currently represented by Representative Janet Cruz, a Hispanic Democrat.  Under the 2010 Census, Benchmark House District 58 was composed of a 17.9% BVAP and 49.8% HVAP, and was underpopulated by 24,781 people, or 15.8%.  Benchmark House District 59, which includes population from Hillsborough County, is currently represented by Representative Betty Reed, a black Democrat.  Under the 2010 Census, Benchmark House District 59 was composed of a 54.0% BVAP and 21.7% HVAP, and was underpopulated by 15,027 people, or 9.6%. Benchmark House District 112, which includes population from Collier County, is currently representative by Representative Jeanette Nunez, a Hispanic Republican.  Under the 2010 Census, Benchmark House District 112 was composed of a 11.6% BVAP and 71.4% HVAP, and was overpopulated by 53,878 people, or 34.4%.

25.    Under the enacted House Plan, the Section 5 covered minority populations in Hillsborough and Collier counties continue to possess the ability to elect their preferred candidates of choice.

26.    Benchmark House District 55 becomes Enacted House District 70 under the House Plan.  Enacted House District 70 includes from Hillsborough County 844 blacks and 3,302 Hispanics of voting age who were not in Benchmark House District 55.  Enacted House District 70 remains a performing minority district with a 45.1% BVAP and 15.3% HVAP.

27.     Benchmark House District 58 becomes Enacted House District 62 under the House Plan. Of the 18,279 blacks of voting age population in Hillsborough County who were in Benchmark House District 58, 9,459—or 51.7%—remain in Enacted House District 62. Of the 50,850 Hispanics of voting age population, 42,700—or 84.0%—remain in Enacted House District 62. Enacted House District 62 also includes from Hillsborough County 6,182 blacks and 21,313 Hispanics of voting age who were not in Benchmark House District 58. Enacted House District 62 remains a performing minority district with a 12.7% BVAP and 51.9% HVAP.

28.     Benchmark House District 59 becomes Enacted House District 61 under the House Plan. Of the 55,208 blacks of voting age population in Hillsborough County who were in Benchmark House District 59, 48,162—or 87.2%—remain in Enacted House District 61. Of the 22,154 Hispanics of voting age population, 14,395—or 65.0% remain in Enacted House District 61. Enacted House District 61 also includes from Hillsborough County 11,333 blacks and 9,516 Hispanics of voting age who were not in Benchmark House District 59. Enacted House District 61 remains a performing minority district with a 51.3% BVAP and 20.6% HVAP.

29.     Benchmark House District 112 becomes Enacted House District 105 under the House Plan. Of the 2,856 blacks of voting age population in Collier County who were in Benchmark House District 112, 2,652—or 92.9%—remain in Enacted House District 105. Of the 9,353 Hispanics of voting age population in Collier County who were in Benchmark House District 112, 8,791—or 94.0%—remain in Enacted House District 105. Enacted House District 105 also includes from Collier County 2,000 blacks and 8,215 Hispanics of voting age who were not in Benchmark House District 112. Enacted House District 105 remains a performing minority district with an 11.1% BVAP and 69.0% HVAP.

30.     Within the covered counties, the Congressional Benchmark Plan contained three
performing districts where minority populations had the ability to elect their preferred candidates
of choice—Benchmark Congressional Districts 18, 23, and 25.  Benchmark Congressional
District 18, which includes population from Monroe County, is currently represented by Ileana
Ros-Lehtinen, an Hispanic Republican.  Under the 2010 Census, Benchmark Congressional
District 18 was composed of 7.8% BVAP and 67.2% HVAP, and was overpopulated by 16,445
people, or 2.4%.  Benchmark Congressional District 23, which includes population from Hendry
County, is currently represented by Alcee Hastings, a black Democrat.  Under the 2010 Census,
Benchmark Congressional District 23 was composed of 54.0% BVAP and 17.8% HVAP, and
was underpopulated by 12,238 people, or 1.8%.  Benchmark Congressional District 25, which
includes population from Monroe and Collier Counties, is currently represented by David Rivera,
an Hispanic Republican.  Under the 2010 Census, Benchmark Congressional District 25 was
composed of 10.3% BVAP and 72.2% HVAP, and was overpopulated by 110,831 people, or
15.9%.

31.     Under the enacted Congressional Plan, the Section 5 covered minority
populations in Benchmark Congressional Districts 18, 23, and 25 continue to possess the ability
to elect their preferred candidates of choice.

32.     Benchmark Congressional District 18 becomes Enacted Congressional District 26
under the Congressional Plan.  All of the Hispanic population from Monroe County that was
within Benchmark Congressional District 23 remains in Enacted Congressional District 26.
Enacted Congressional District 26 remains a performing minority district with 68.9% HVAP.

33.     Benchmark Congressional District 23 becomes Enacted Congressional District 20
under the Congressional Plan.  All of the black and Hispanic population from Hendry County

that was within Benchmark Congressional District 23 remains in Enacted Congressional District

20.  Enacted Congressional District 20 also includes from Hendry County 378 blacks and 3,275

Hispanics of voting age who were not in Benchmark Congressional District 23.  Enacted

Congressional District 20 remains a performing minority district with 50.1% BVAP and 18.5%

HVAP.

34.     Benchmark Congressional District 25 becomes Enacted Congressional District 25

under the Congressional Plan.  Of the 36,504 Hispanics of voting age population in Collier

County who were in Benchmark Congressional District 25, 32,440—or 88.9%—remain in

Enacted Congressional District 25.  In addition, Enacted Congressional District 25 includes

7,266 HVAP from Collier County that was not in Benchmark Congressional District 25, and

7,956 HVAP from Hendry County that was not in Benchmark Congressional District 25.

Enacted Congressional District 25 remains a performing minority district with 70.7% HVAP.

35.     In addition, Benchmark Congressional District 11, which includes population

from Hillsborough County, was composed of 26.8% BVAP and 25.8% HVAP under the

benchmark plan.  Attorneys in the Justice Department's Voting Rights Section have previously

opined that similar districts must be protected against retrogression under Section 5.  *See League

of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 479 (2006) (Stevens, J., concurring in part

and dissenting in part) ("According to the unanimous report authored by staff attorneys in the

Voting Section of the Department of Justice, black voters in District 24 generally voted

cohesively, and thus had the ability to elect their candidate of choice . . . ."); *id.* at 443 (plurality

opinion) (explaining that "District 24 had elected Anglo Democrat Martin Frost to Congress in

every election since 1978," and that the District was composed of 25.7% citizen BVAP and

20.8% citizen HVAP).  The ability to elect in this district has not been diminished in the enacted

Congressional Plan.  Enacted Congressional District 14 contains 25.6% BVAP and 25.6% HVAP under the Congressional Plan.

36.     Within the covered counties, the Senate Benchmark Plan contained two performing districts where minority populations had the ability to elect their preferred candidates of choice—Benchmark Senate District 18 and Benchmark Senate District 39.  Benchmark Senate District 18, which includes population from Hillsborough County, is currently represented by Senator Arthenia Joyner, a black Democrat.  Under the 2010 Census, Benchmark Senate District 18 was composed of 39.5% BVAP and 23.3% HVAP, and was underpopulated by 65,211 people, or 13.9%.  Benchmark Senate District 39, which includes population from Collier, Hendry, and Monroe Counties, is currently represented by Senator Larcenia Bullard, a black Democrat.  Under the 2010 Census, Benchmark Senate District 39 contained 29.1% BVAP and 43.0% HVAP, and was underpopulated by 13,150 people, or 2.8%.

37.     Under the enacted Senate Plan, the Section 5 covered minority populations in Benchmark Senate Districts 18 and 39 continue to possess the ability to elect their preferred candidates of choice.

38.     Benchmark Senate District 18 becomes Enacted Senate District 19 under the Senate Plan.  Of the 75,574 blacks of voting age in Hillsborough County who were in Benchmark Senate District 18, 72,738—or 96.2%—remain in Enacted Senate District 19.  Of the 60,872 Hispanics of voting-age population in Hillsborough County who were in Benchmark Senate District 18, 58,334—or 95.8%—remain in Enacted Senate District 19.  Enacted Senate District 19 also includes from Hillsborough County 12,880 blacks and 26,463 Hispanics of voting age who were not in Benchmark Senate District 18.  Enacted Senate District 19 remains a performing minority district with 37.2% BVAP and 27.4% HVAP.

39.     Benchmark Senate District 39 becomes Enacted Senate District 39 under the Senate Plan.  All of the black and Hispanic population from Hendry and Monroe Counties that was within Benchmark Senate District 39 remains in Enacted Senate District 39.  Of the 4,775 blacks of voting age in Collier County who were in Benchmark Senate District 39, 4,455—or 93.3%—remain in Enacted Senate District 39.  Of the 17,269 Hispanics of voting age in Collier County who were in Benchmark Senate District 39, 15,615—or 90.4%—remain in Enacted Senate District 39.  Enacted Senate District 39 also includes from Collier County an additional 204 blacks and 332 Hispanics of voting age who were not in Benchmark Senate District 39. Enacted Senate District 39 remains a performing minority district with 35.3% BVAP and 39.7% HVAP.

40.     Under SJR 2-B, the two districts in which minorities have the ability to elect their preferred candidates contain, in the aggregate, 97,511 blacks and 124,883 Hispanics of voting age from Section 5 counties, compared to 87,583 and 102,307, respectively, in the benchmark.

41.     The House, Senate, and Congressional Plans cannot be implemented until this Court enters a declaratory judgment as requested by Plaintiff, or until the Plans are administratively precleared by the United States Department of Justice.

42.     A voting change is administratively precleared once a complete submission has been filed with the Attorney General and the Attorney General has interposed no objection within sixty days.  42 U.S.C. § 1973c(a); *Morris v. Gressette*, 432 U.S. 491, 502 (1977); *Georgia v. United States*, 411 U.S. 526, 539 (1973).

43.     Plaintiff filed complete submissions for administrative preclearance with the Department of Justice for SJR 1176 and SB 1174 on March 13, 2012, and intends to file a

complete submission for administrative preclearance with the Department of Justice for SJR 2-B on March 30, 2012.

## Justiciability

44.     The House, Senate, and Congressional Plans are ripe for a determination that they have neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, and do not lead to a retrogression in the position of racial or language group minorities or diminish their ability to elect their preferred candidates of choice.

45.     Pursuant to the Florida Constitution, SJR 2-B will be submitted for approval by the Florida Supreme Court, but that constitutionally-mandated approval process does not delay this Court's preclearance review.  Within fifteen days after adjournment of the Legislature's extraordinary apportionment session, the Florida Attorney General is required to submit SJR 2-B to the Florida Supreme Court for a determination of its validity.  *See* Fla. Const. art. III, § 16(e). The Florida Constitution directs the Florida Supreme Court to enter its judgment of validity within 30 days after the filing of the petition.  *See id.* art. III, §§ 16(a) & (e).  This Court's preclearance review can go forward during the pendency of the Florida Supreme Court approval process because that "final approving action" does "not subject [SJR 2-B] to alteration."  28 C.F.R. § 51.22(b).  Instead, the Florida Supreme Court may alter SJR 2-B only if it finds that SJR 2-B is invalid.  *See* Fla. Const. art. III, § 16(f).

46.     It is important that the Court act upon Plaintiff's claims at the earliest practicable date.  The next general election for the Florida House of Representatives, the Florida Senate, and the United States House of Representatives will occur on November 6, 2012.  The state primary elections for these offices will be held on August 14, 2012, and the candidate qualifying period

for the 2012 primary elections is June 4, 2012 through June 8, 2012.  In order to preserve the existing election calendar, it is necessary that this Court consider and decide this controversy prior to the opening of the candidate qualifying period.

## Count I

47.     Each and every allegation contained in paragraphs one through forty-six is reaffirmed and realleged as if fully incorporated herein.

48.     The House Plan in SJR 1176 does not have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in 42 U.S.C. § 1973b(f)(2), in the five Florida counties covered by Section 5.

49.     Plaintiff is entitled to a judgment that SJR 1176 fully complies with Section 5 of the Voting Rights Act of 1965, as amended, and that SJR 1176 may be implemented without further delay.

## Count II

50.     Each and every allegation contained in paragraphs one through forty-six is reaffirmed and realleged as if fully incorporated herein.

51.     The Congressional Plan in SB 1174 does not have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in 42 U.S.C. § 1973b(f)(2), in the five Florida counties covered by Section 5.

52.     Plaintiff is entitled to a judgment that SB 1174 fully complies with Section 5 of the Voting Rights Act of 1965, as amended, and that SB 1174 may be implemented without further delay.

14

## Count III

53.     Each and every allegation contained in paragraphs one through forty-six is reaffirmed and realleged as if fully incorporated herein.

54.     The Senate Plan in SJR 2-B does not have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in 42 U.S.C. § 1973b(f)(2), in the five Florida counties covered by Section 5.

55.     Plaintiff is entitled to a judgment that SJR 2-B fully complies with Section 5 of the Voting Rights Act of 1965, as amended, and that SJR 2-B may be implemented without further delay.

## Count IV: Alternative Claim

56.     Each and every allegation contained in paragraphs one through forty-six is reaffirmed and realleged as if fully incorporated herein.

57.     If this Court declines to enter a declaratory judgment that either the House, Senate, or Congressional Plan complies with Section 5 of the Voting Rights Act of 1965, as amended, then, alternatively, the State of Florida seeks declaratory judgment that Section 5 impermissibly exceeds Congress's constitutional authority because it is not appropriate legislation to enforce either the Fourteenth Amendment or Fifteenth Amendment to the United States Constitution.

58.     In July 2006, Congress reauthorized Section 5, extending it for twenty-five years (until 2031).  It relied on generalized findings which do not specifically identify evidence of continuing intentional discrimination in covered jurisdictions.  Nor did it have evidence that adequately distinguished conditions in covered jurisdictions from those in non-covered

jurisdictions in a way that would justify the continuing difference in treatment for another twenty-five years.

59.     The conditions of 1975 that caused the five counties in Florida to be covered by Section 5 have long been remedied.  Nonetheless, Congress determined that those counties should continue to be covered based on data that is more than 35 years old and fails to account for current political conditions.

60.     Section 5 requires covered jurisdictions to seek preclearance for any changes in voting practices or procedures.  The preclearance process is costly and burdensome, and requires unnecessary and disruptive delays.  It also deprives covered jurisdictions of essential attributes of self-governance.

61.     In 2006, Congress did not simply extend Section 5's substantive mandate on covered jurisdictions.  It significantly expanded the substantive standards to coerce jurisdictions to maintain and adopt race-based electoral schemes that prefer certain groups.

62.     First, Congress expanded the prohibition against voting changes with the purpose or effect of "denying or abridging the right to vote," 42 U.S.C. 1973c(a) (emphasis added), to also prohibit changes with the purpose or effect of "diminishing the ability of any citizens . . . to elect their preferred candidates of choice," *id.* § 1973c(b) (emphasis added).  The Justice Department and the 2006 Congress interpret Section 5 to protect only "members of a racial or language minority group."  *See* 28 C.F.R. § 51.54(a); *see also* Pub. L. No. 109-246, § 2(b)(9) ("racial and language minority citizens").  This 2006 amendment thus established a floor for minority electoral power in all covered jurisdictions until 2031, regardless of whether minorities in those jurisdictions have an equal opportunity to elect their preferred candidates or to

participate in the political process under the voting change, and regardless of whether there are compelling reasons supporting the voting change.

63.     Second, Congress authorized the Attorney General to require enhancement of minority-preferred candidates' electoral success by authorizing Section 5 objections not only to changes with a *retrogressive* purpose, but also to those which the Attorney General deems to have been motivated by "*any* discriminatory purpose." 42 U.S.C. § 1973c(c) (emphasis added). Particularly given the Justice Department's Section 5 enforcement record concerning changes that do not increase minority preferred candidates' electoral changes to the maximum practicable extent, this expansion of Section 5's scope constitutes at least an implicit command for covered jurisdictions to engage in race-based voting practices and procedures.

64.     Section 5, as amended and extended in 2006, is not a rational, congruent, or proportional means to enforce the Fourteenth and Fifteenth Amendments' nondiscrimination requirements and, in fact, undermines and violates those nondiscrimination guarantees.  This is so because, among other reasons, there is no continuing justification for Section 5's extraordinary burdens on and denials of self governance; there is no persuasive or even rational reason for selectively visiting those burdens on certain jurisdictions based on electoral results from many decades ago; there is no rational or sufficient reason for imposing on covered jurisdictions alone race-conscious requirements in tension with the Constitution and Section 2 of the Voting Rights Act; a continuation of Section 5 until today and 2031 is out of proportion to any legitimate, remedial, or preventive objective; making Section 5's substantive requirements more onerous in 2006 than they were in 1965 is irrational and not congruent or proportional; and the more onerous 2006 standards do not broadly enforce the nondiscrimination guarantees of the

Fourteenth and Fifteenth Amendments, but instead require actions that undermine and violate those Amendments.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(a)     Convene a three-judge district court to hear the matters raised in Plaintiff's Complaint;

(b)     Issue such orders and convene such conferences as may be necessary on an expedited basis to ensure that what little discovery may be necessary in this action be taken and completed as expeditiously as possible;

(c)     Enter such other and further orders as may be necessary during the pendency of this case to ensure that it is handled as expeditiously as possible;

(d)     Enter a declaratory judgment that the House Plan in SJR 1176 satisfies Section 5 of the Voting Rights Act because it has neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, or of diminishing minority voters' ability to elect their preferred candidates of choice, in the five Florida counties covered by Section 5, and that the House Plan in SJR 1176 may be enforced by the State of Florida;

(e)     Enter a declaratory judgment that the Congressional Plan in SB 1174 satisfies Section 5 of the Voting Rights Act because it has neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, or of diminishing minority voters' ability to elect their preferred candidates of choice, in the five Florida counties covered by Section 5, and that the Congressional Plan in SB 1174 may be enforced by the State of Florida;

(f)      Enter a declaratory judgment that the Senate Plan in SJR 2-B satisfies Section 5 of the Voting Rights Act because it has neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, or of diminishing minority voters' ability to elect their preferred candidates of choice, in the five Florida counties covered by Section 5, and that the Senate Plan in SJR 2-B may be enforced by the State of Florida;

(g)      In the alternative, enter a declaratory judgment that Section 5 unconstitutionally exceeds congressional authority and imposes no obstacle to enforcement of the House, Senate, and Congressional Plans; and

(h)      Grant Plaintiff such other and further relief as may be appropriate, including the costs of this action.

*Signature Page Follows*

Respectfully submitted,

**JONES DAY**


*Michael Carr* /MHN

Andy Bardos                                   Michael A. Carvin
Special Counsel to the President              D.C. Bar No. 366784
The Florida Senate                            macarvin@jonesday.com
404 South Monroe Street, Suite 409            51 Louisiana Avenue, NW
Tallahassee, Florida 32399                    Washington, DC  20001
(850) 487-5914                                (202) 879-7643

*Attorneys for the Florida Senate*


George T. Levesque
Charles T. Wells *                            General Counsel
George N. Meros, Jr. *                        Florida House of Representatives
Jason L. Unger *                              422 The Capitol
Allen Winsor *                                Tallahassee, Florida 32399-1300
Charles B. Upton II *                         (850) 410-0451
GrayRobinson, P.A.                            George.Levesque@myfloridahouse.gov
Post Office Box 11189
Tallahassee, Florida 32302                    Miguel De Grandy *
 (850) 577-9090                               800 Douglas Road, Suite 850
Charles.Wells@gray-robinson.com               Coral Gables, Florida 33134
George.Meros@gray-robinson.com                (305) 444-7737
Jason.Unger@gray-robinson.com                 mad@degrandylaw.com
Allen.Winsor@gray-robinson.com
CB.Upton@gray-robinson.com

*Attorneys for the Florida House of Representatives*
*\* Pro Hac Vice Motions Forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 30th day of March, 2012, I caused a true and correct copy of

the foregoing to be served on the following counsel of record by hand-delivery:

> Janie Allison Sitton
> Civil Rights Division, Voting Section
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Room 7266-NWB
> Washington, DC 20530

> *Attorney for Defendants*

Michael A. Carvin